IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 4, 2024

**STATE OF TENNESSEE v. LATARIUS CURRY**

**Appeal from the Criminal Court for Shelby County**
**No. 19-01270      Paula L. Skahan, Judge**

_____

**No. W2023-01789-CCA-R3-CD**

_____

The Shelby County Grand Jury indicted Latarius Curry, Defendant, on one count each of aggravated child abuse and aggravated child neglect.  A jury convicted Defendant as charged, and the trial court imposed an effective 22-year sentence.  Defendant appeals, arguing that the evidence was insufficient to support his convictions.  Having reviewed the entire record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which J. ROSS DYER and KYLE A. HIXSON, JJ., joined.

Tony N. Brayton, Memphis, Tennessee, for the appellant, Latarius Curry.

Jonathan Skrmetti, Attorney General and Reporter; Abigail H. Rinard, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Venecia Patterson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The victim's mother, K.W.,[1] met Defendant through an online dating site.  They later met in person at a party and then began "talking more on the phone" and spending time together.  Defendant occasionally stayed at K.W.'s apartment, where she lived with her three children, ages seven, six, and one year old at that time.  The one-year-old victim, T.W., was walking, talking, and developing normally.

_____

[1] We refer to the minor victim and her family by their initials to protect her identity.

Around May of 2018, Defendant watched K.W.'s children while she worked 12-hour shifts. K.W. testified that Defendant only watched them three or four times and that she also asked her mother, S.W., or the children's father to watch them. K.W. had observed Defendant with her children. She said that the victim "cried all the time" around Defendant and that she did not cry around anyone else. Defendant played "roughly" with the children, "tussling with them, pushing them." K.W. told Defendant he was "too rough," and Defendant responded that "he was just playing." The victim's sister, T.K., testified that anytime Defendant babysat them, he would keep the victim in the bedroom all day and T.K. could hear the victim crying.

On June 12, 2018, K.W.'s six- and seven-year-old children told K.W. they had dropped the one-year-old victim on her head on the concrete. T.K. testified that she was holding the victim while being chased by their brother, and T.K. fell and dropped the victim. K.W. did not see any injuries to the victim, but she took her to the hospital to be checked. K.W. testified, "They checked her head and stuff, and they said everything was fine." After that incident, the victim showed no unusual symptoms.

S.W. kept the children from July 11 through July 13, 2018. When she picked up the children from K.W.'s apartment, she noticed that the victim's wrist was swollen. She asked K.W. about the victim's wrist, and K.W. said Defendant "was always swinging [the victim], swinging her around by her arms." S.W. did not trust Defendant to watch the children. She testified, "[E]very time [Defendant] came around [the victim] she would flinch and I felt something was wrong. [The victim] would flinch and she would cry a lot."

On July 14, 2018, K.W. woke up around 5:00 a.m. to get ready to leave for work. She saw the victim before she left, and the victim seemed normal. Later that morning, Defendant sent K.W. a text message, "saying something was wrong with [the victim]." Defendant said the victim had a seizure. K.W. called her mother, who was at Walmart with her cousin, M.M., to pick up K.W. from work. M.M. testified it took 15 to 20 minutes to drive to K.W.'s workplace and ten minutes to drive from her workplace to her apartment.

When they arrived, Defendant was holding the victim, "and her eyes w[ere] rolling[,]" and "she was stiff[.]" They rushed the victim to Le Bonheur Children's Hospital, and K.W. called 911 on the way to the hospital. S.W. testified that Defendant was "calm" on the way to the hospital. When they arrived, emergency personnel were waiting for them. Doctors told K.W. that the victim "had lacerations to her liver" and that "her skull was bleeding."

Defendant told K.W. that he had given the victim "some cereal and she started throwing up and that basically was it." While they were in the waiting room at the hospital,

Defendant asked S.W. if she thought "that he did it[,]" meaning that Defendant had "something to do" with the victim's injuries. S.W. heard Defendant ask a doctor if an x-ray would "show how it happened[.]"

Tracey Dalton lived in the same apartment complex as K.W. and her children at the time of the incident. Defendant went to her apartment at around 8:40 a.m. and asked for help because the victim was having a seizure. Ms. Dalton had a history of seizures. Defendant told Ms. Dalton that the victim had been throwing up. Ms. Dalton observed blood on the victim from where she had bitten her tongue, and she felt a quarter-size bump on the left side of the victim's head above her ear. Ms. Dalton cleaned the victim, changed her clothes, and gave her a pacifier to prevent her from biting her tongue. Defendant was "pacing" and "acting strange[.]" Ms. Dalton urged him to "call [K.W.], call the ambulance, call somebody." Defendant said, "Oh sh[**], Oh sh[**]," and he would not tell Ms. Dalton what happened to the victim. Ms. Dalton gave Defendant her phone and told him to call 911 "[s]everal times" while she tended to the victim. Defendant did not call 911.

Ms. Dalton recalled Defendant having said that the victim "didn't like him." She testified that on one occasion, Defendant "came in the room and [the victim] just flinched, like, fell on the floor, like she didn't want to deal with him."

Memphis Police Department ("MPD") Lieutenant Adrienne Dobbins was assigned as the lead investigator in this case. She spoke to K.W. and S.W. at the hospital. The victim was in critical condition and ventilated.

Lieutenant Dobbins took a statement from Defendant on July 15, 2018. She advised Defendant of his rights, and Defendant agreed to waive his rights and speak with Lieutenant Dobbins. Defendant stated that he met K.W. on an online dating site. S.W. had returned the children to K.W.'s apartment on the day prior to the incident. Defendant described the victim as "doing fine." The next morning, the victim woke up early and got into K.W.'s bed. At around 7:30 or 8:00 a.m., Defendant fed her cereal, and then she laid down and fell asleep. Defendant noticed she was shivering and covered her with a blanket. She slept for about fifteen minutes, and then "she woke up and she looked at [Defendant] and he looked at her and then she vomited." Defendant said she vomited on herself and him. The victim's body began to shake, her arms stiffened, and she was grinding her teeth. Her eyes rolled back, and Defendant put a towel in her mouth to stop her teeth grinding. Defendant said the victim was having trouble breathing. Defendant then went to Ms. Dalton's apartment to ask for help because he knew that she suffered from seizures. Defendant disregarded Ms. Dalton's advice to call 911 because he wanted to speak to K.W. first. Defendant cleaned up the vomit and changed his clothes while Ms. Dalton tended to the victim. Defendant told Lieutenant Dobbins, "I'm not going to lie, I started slick panicking." Defendant did not explain the cause of the victim's injuries. He also stated

that the victim's siblings were present in the apartment that morning but asleep in another room.

MPD Lieutenant Nathan Wilbern took photographs and executed a search warrant at K.W.'s apartment. He collected an orange onesie with stains, a towel, and a comforter. When Lieutenant Wilbern arrived at the apartment, it "smelled like bleach."

Dr. Karen Lakin was qualified as an expert in child abuse and medical care for child maltreatment. Dr. Lakin treated the victim at Le Bonheur. The victim was "actively seizing" and "critically ill." She was hypoxic and had been deprived of oxygen "for a prolonged period of time." Doctors placed the victim on a ventilator and gave her oxygen and a blood transfusion. They also gave her medication to "get control of the seizure activity."

CT scans showed that the victim had subdural hemorrhaging predominantly on the right side of her head and a smaller amount on the left side. The victim also had hemorrhaging between the two hemispheres of the brain. Her skull was not fractured, "[s]o everything was internal bleeding into her brain." Dr. Lakin explained that pressure around the brain can compromise blood flow and oxygen to the brain, which "can cause a lot of problems, because it will kill the cells very quickly." The victim "already had some evidence that there w[as] compromise that was going on[.]" An MRI showed cellular damage or "swelling of the actual cells" of the victim's brain.

The scans also revealed a "quite severe" laceration to the victim's liver and "extensive external bruising across her abdomen." The victim also had bruising on her face and extremities. The victim's amylase and lipase levels were elevated, which can indicate an injury to the pancreas. Blood had also collected in the abdomen. X-rays revealed "older" fractures in the victim's forearms at different stages of healing.

Photographs taken of the victim at the hospital were published to the jury. She had bruising and discoloration on her abdomen and the left side of her face.

Dr. Lakin spoke to K.W. and Defendant at the hospital. Defendant denied having any knowledge of any physical trauma to the victim. K.W. described the victim's June 12 fall but stated that the victim had been seen by a doctor and had not had any issues since then. Dr. Lakin described the victim's brain and liver injuries as "acute," meaning they could not have been caused by the victim's previous fall. She testified that the victim would not have been able to eat or function normally on the morning of the incident with the acute brain and liver injuries she suffered. She did not think the victim's arm fractures occurred at the same time as her brain and liver injuries.

Dr. Lakin stated, in her opinion, the victim's injuries were not the result of an accident. She based her opinion on the victim's lack of a history of trauma "which would explain this type of injury." She further explained, "These are actually injuries that we consider to be highly suspicious for non-accidental trauma, specifically abusive head trauma, because there is no fracture that is associated with all of that blood that we saw inside of her head." Dr. Lakin concluded that the victim's injuries were consistent with some type of non-accidental, blunt force trauma, which had to have occurred after 7:00 a.m., when Defendant reported the victim ate breakfast and acted normally. Dr. Lakin also testified that the delay in medical care exacerbated the victim's injuries. She agreed that the victim's prognosis would have "[c]ertainly" been better if Defendant had not waited to call 911 or take the victim to the hospital. The victim had "cytotoxic edema, which is swelling of the actual cells of the brain." Dr. Lakin explained that it "is a secondary effect of the initiating trauma and also much more damaging" because a lack of oxygen to the brain causes the brain cells to die. The victim's scans showed areas of ischemic damage, or dead brain tissue.

The victim was in the hospital "for just over a month." At the time of trial, the victim was six years old. She was still unable to walk and used a wheelchair, and she was being fed through a "G-tube."

Defendant did not testify or present any evidence at trial. The jury convicted Defendant as charged, and the trial court imposed an effective 22-year sentence after a sentencing hearing. The trial court denied Defendant's motion for new trial, and Defendant appeals.

*Analysis*

On appeal, Defendant asserts that the evidence was insufficient to support his convictions for aggravated child abuse and aggravated child neglect. He contends that the proof was insufficient to show that he caused the victim's injuries or that his failure to seek timely medical treatment for the victim resulted in serious bodily injury to the victim. The State responds that the evidence was sufficient to support both of Defendant's convictions. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and

circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State the "strongest legitimate view of the evidence" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

As relevant here, "A person commits the offense of aggravated child abuse [or] aggravated child neglect . . . who commits child abuse, as defined in § 39-15-401(a)[,] [or] child neglect, as defined in § 39-15-401(b)[,] . . . and: (1) The act of abuse [or] neglect . . . results in serious bodily injury to the child." T.C.A. § 39-15-402(a)(1). "'Serious bodily injury to the child' includes, but is not limited to, . . . subdural or subarachnoid bleeding[.]" *Id*. § 39-15-402(c). Child abuse occurs when "[a]ny person . . . knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury[.]" *Id*. § 39-15-401(a). A person commits child neglect who "knowingly . . . neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare." *Id*. § 39-15-401(b). "[B]efore a conviction for child neglect may be sustained, the State must show that the defendant's neglect produced an actual, deleterious effect or harm upon the child's health and welfare." *State v. Mateyko*, 53 S.W.3d 666, 671-72 (Tenn. 2001). "[T]he mere risk of harm is insufficient to support a conviction." *Id*. at 667.

The evidence, viewed in the light most favorable to the State, showed that the victim was in the sole care of Defendant on the morning of July 14, 2018. Before K.W left for work, the one-year-old victim seemed fine and had no visible injuries. By Defendant's own account, the victim ate cereal that morning. According to Dr. Lakin, the victim would not have been able to eat or function properly due to her acute injuries. Dr. Lakin concluded that the trauma must have occurred between 7:00 and 9:00 a.m. after the victim ate breakfast. When the victim arrived at the hospital around 10:00 a.m., she was actively seizing, had subdural hemorrhaging, a severe liver laceration, extensive bruising, and labored breathing. In Dr. Lakin's opinion, the injuries were consistent with non-accidental, blunt force trauma. Ms. Dalton testified that Defendant was "acting strange" and pacing around. S.W. noted that Defendant seemed "calm" on the way to the hospital and that he asked doctors if an x-ray of the victim would "show how it happened."

Additionally, K.W., S.W., and T.K. had all observed Defendant with the victim and testified that the victim "cried all the time" around Defendant, that she "didn't like" Defendant, and that she "flinched" when Defendant was around her. Defendant asserts that because "[n]obody witnessed [Defendant] abuse [the victim] on the morning of July 14, 2018 and no witness heard [the victim] scream or cry out for help[,]" the evidence was insufficient to establish aggravated child abuse. He asserts that the victim "clearly suffered abuse from members of her own family" and points to evidence of previous injuries, including the victim's healing arm fractures and her fall to the concrete when she was dropped by her older sibling. However, the jury rejected this theory and reasonably inferred from the evidence that Defendant caused the victim's injuries. The evidence is sufficient to support Defendant's aggravated child abuse conviction.

- 7 -

We also conclude that the evidence is sufficient to support Defendant's conviction for aggravated child neglect. Defendant told Lieutenant Dobbins that he fed the victim around 7:30 or 8:00 a.m. and that the victim went to sleep and woke up around 8:15 a.m. When she woke up, she began vomiting, seizing, and having trouble breathing. Defendant did not immediately seek help. He put a towel in the victim's mouth "to stop her . . . from grinding her teeth." He went to the neighbor's apartment at around 8:40 a.m. Despite Ms. Dalton's repeated insistence that Defendant call 911, Defendant waited for K.W. to arrive home and drive the victim to the hospital. The victim arrived at the hospital at around 10:00 a.m., almost two hours after she began having symptoms. The delay in seeking medical attention adversely affected the victim's health and welfare. Dr. Lakin explained, "[Y]ou are going to compound the problem of a child that's seizing if they are not breathing well, getting oxygen to [the brain]."

Defendant argues that "[t]he State failed to produce evidence of serious bodily injury, separate from the serious bodily injury attributed to the aggravated child abuse count, to support a conviction for aggravated child neglect." Defendant cites several cases in support of his position that there was insufficient evidence to establish that a delay in seeking medical attention actually caused serious bodily injury beyond those injuries sustained as a result of abuse inflicted on the victim. *See Mateyko*, 53 S.W.3d at 671 (holding the "mere risk of harm" is insufficient to prove child neglect); *State v. Wiggins*, W2006-01516-CCA-R3-CD, 2007 WL 3254716, at *4 (Tenn. Crim. App. Nov. 2, 2007) (reversing aggravated child neglect conviction where proof was insufficient to show the defendant's failure to seek medical treatment resulted in serious bodily injury), *perm. app. denied* (Tenn. Mar. 3, 2008); *State v. Freeman*, W2005-02904-CCA-R3-CD, 2007 WL 426710, at *8 (Tenn. Crim. App. Feb 6, 2007) (testimony that "if the victim had received prompt medical attention, she might have survived," did not establish that the failure to seek medical attention caused serious bodily injury), *no perm. app. filed*; *State v. Barlow*, No. W2008-01128-CCA-R3-CD, 2010 WL 1687772, at *11 (Tenn. Crim. App. Apr. 26, 2010) (testimony that "time in these injuries is of the essence" and "[Y]ou never know what difference it would make" was insufficient to prove that the delay in medical treatment "produced an actual or deleterious effect or harm upon the child's health and welfare"), *perm. app. denied* (Tenn. Sept. 24, 2010).

Here, Dr. Lakin testified that the cytotoxic edema, and resulting dead brain tissue, was a "secondary effect" of the initial trauma, and that the victim's prognosis would have "[c]ertainly" been better if she had received immediate medical treatment. This evidence is sufficient to establish that Defendant's significant delay in seeking medical treatment for the victim, who was having seizures and difficulty breathing, resulted in serious bodily injury to the victim. Defendant is not entitled to relief.

CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE